Loreen L. WEST, Administratrix, etc.,
Appellant,

v.

Walter J. LUCHESI et al., d/b/a, etc.,
Appellees.

Willie D. BLACKWELL, Administrator, etc.,
Cross-Appellant,

v.

Loreen L. WEST, Administratrix, etc.,
Cross-Appellee.

Court of Appeals of Kentucky.

Feb. 15, 1974.

Rehearing Denied June 7, 1974.

Charles A. Williams, Paducah, for appellant and cross-appellee.

Francis T. Goheen, E. Palmer James, Julian M. Carroll, Paducah, for appellees.

Julian M. Carroll, Francis T. Goheen, Paducah, for cross-appellant.

STEINFELD, Justice.

On May 9, 1968, a dark and hazy night, at about 9:30 p. m. a limousine [1] which served the Paducah airport was being driven westwardly on U.S. 60 by Mary Blackwell. Roy West, whose administratrix is appellant, was riding his motorcycle in the same direction ahead of the limousine, with a car being driven by Mr. R. L. King traveling between him and the limousine. As West turned leftwardly to enter Holt Road, the limousine, having passed the King automobile, struck the motorcycle. Both West and Mrs. Blackwell were killed.

In the litigation which followed a verdict of $250,000 was rendered in favor of West's estate, but a new trial was granted on the ground that the verdict was excessive and for other reasons. On the second trial the jury found both West and Mrs. Blackwell guilty of negligence. A judgment was entered dismissing all claims, from which judgment West's administratrix appeals and Mrs. Blackwell's administrator cross-appeals. Luchesi, et al did not appeal or cross-appeal. We affirm.

Each of the parties at the first trial had requested that a verdict in his favor be directed dismissing the claims being asserted against him. The trial court denied these requests.

West claims that the trial court erred in not sustaining his motion for a directed verdict and that the first verdict should not have been set aside, but if we hold that voiding the first verdict was not error the second trial should have been limited to damages only. Blackwell and Luchesi, et al argue that in both trials a directed verdict in their favor was appropriate and Blackwell argues that he should recover damages.

U.S. 60 runs east and west. Holt Road enters U.S. 60 from the south. West lived in a residence located at the southwest corner of that intersection. Mr. and Mrs. King, who live on U.S. 60 a short distance west of Holt Road, were returning to their home from Paducah, which city is approximately three miles to the east. They were the only eye witnesses to the accident. Mr. King testified at both trials, while Mrs. King appeared only at the second trial. Their testimony was substantially the same in all instances.

After leaving the city Mr. King, while driving at about fifty miles per hour, observed a dim red light some distance ahead of him and moving in the same direction in which he was traveling, but he was unable to tell what it was. He described the light as appearing somewhat dimmer than a bicycle reflector. Mr. King slowed his speed to approximately thirty-five miles per hour and followed the light for a mile or more, still unable to tell what it was. When he had come within 100 feet or a little more of the red light, he realized that it was a motorcycle. Also he became aware of the presence of the limousine passing him on the left. The limousine continued on and just after it had gotten by him and while it was still in the passing lane the motorcycle turned left across the centerline into the limousine's passing lane. The impact,

King testified, occurred two feet or a little more south of the centerline, with the right front of the limousine colliding with the left side of the motorcycle. The testimony regarding the point of impact was supported by the testimony of a police officer. The officer testified about marks in the surface of the road which were made by the vehicles involved in the collision.

After the collision the motorcycle continued in a northwestwardly direction approximately 103 feet and the limousine finally came to rest against a tree in West's yard, a distance of 164 feet from the point of impact. Mr. King was asked whether West gave a signal of his intention to make a left turn. The pertinent questions and answers were as follows:

"Q34 Are you in a position to say whether he did or did not give a signal?

A No, I am not.

Q35 In other words, he may have given one but you didn't see it, is that what you are saying?

A That's right, I didn't see one.

\* \* \* \* \* \*

Q5 Do you believe if such a signal had been given that you would have seen it, since you were looking straight ahead?

A I couldn't say that."

Mr. King stated that no horn or other signal was sounded by the limousine as it attempted to pass. KRS 189.340 requires a motorist to give such a warning before passing. KRS 189.380(1) prohibits a left turn by a vehicle unless it can be made in reasonable safety. Four headlights were following West only a short distance behind him, two of which were in the passing lane when he attempted to make the left turn. Counsel for West calls our attention to Maybrier v. Baldwin, Ky., 442 S.W.2d 585 (1969), in which a left-turning vehicle was absolved by law of any negligence in turning, it having been struck

from the rear by another vehicle which was attempting to pass it. In Maybrier we said,

> "Nowhere in the evidence was there any testimony by any witness, express or implied, that Baldwin (the passing vehicle) turned (into the passing lane) *before* Mrs. Maybrier (the left turning vehicle) turned, or that he did so in time for her to observe his movement before undertaking her own."

Here, there was conclusive evidence that the limousine had turned into the passing lane before West attempted to make his left turn and that the limousine had been in that lane for sufficient time for West to observe its movements before he undertook to turn.

 It is our opinion that the evidence of the violation of statutory duties by West convicted him of contributory negligence as a matter of law, wherefore the court should have sustained the motions to dismiss the claim being asserted by West's administratrix. However, this did not mean that Mrs. Blackwell, et al were entitled to recover on their claims, because at the very least the evidence of statutory violations by Mrs. Blackwell created a jury issue as to her contributory negligence as a claimant. Wright v. Clausen, 263 Ky. 298, 92 S.W.2d 93 (1936); Jewell v. Oglesby, Ky., 402 S.W.2d 439 (1966).

On the claim of West, we agree that it was error for the court not to dismiss that claim. On the claim asserted by Blackwell's administrator and Luchesi, et al, whether it was error not to sustain West's motion to dismiss we need not decide as the jury found in the first trial (and in the second trial which Blackwell's administrator and Luchesi, et al had requested) that the driver of the limousine was negligent.

Other issues were presented, but we deem it unnecessary to discuss them.

The judgment is affirmed.

All concur, except OSBORNE, C. J., and REED, J., who dissent.

OSBORNE, C. J., files a dissenting opinion, in which REED, J., joins.

OSBORNE, Chief Justice (dissenting).

As I view this case one of the problems presented is basically a problem of statutory construction. Our previous cases construing the statutes involved are not all in accord. The crux of the matter is whether or not our statutes relating to traffic regulations do in fact place an absolute duty upon a left-turning vehicle to ascertain, at the exact moment the turn is made, whether the left lane of the highway is in fact clear of passing vehicles traveling in the same direction as the turning vehicle. KRS 189.300(1) provides:

> "The operator of any vehicle when upon a highway shall travel upon the right side of the highway whenever possible, and unless the left side of the highway is clear of all other traffic or obstructions and presents a clear vision for a distance of at least one hundred and fifty (150) feet ahead."

This would seem, at first blush, to be a statute controlling passing and require that the passing vehicle make sure that the passing lane is clear for 150 feet ahead, viz: the lane not be occupied by other vehicles or that there be no curves or hills that would obstruct the view. However, it might be arguable that this section also deals with left-turning vehicles.

KRS 189.330(1) provides:

> "When turning to the right at an intersection of highways, vehicles shall keep to the right of the center, and in turning to the left shall pass to the left of the center, keeping, however, as far to the right as is possible to do so and still pass to the left of the center. In this subsection "center" means the meeting point of the medial lines of the two highways."

It would seem that this only outlines the track that the vehicle should follow in making the turn and in no way regulates or prescribes the duties of the driver relative to other vehicles upon the road.

KRS 189.340, according to its heading, regulates Overtaking Vehicles-Traffic Lanes-Following Vehicles. Subsection 3 provides as follows:

"No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless the left side is clearly visible and free of oncoming traffic for a sufficient distance ahead to permit overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. In every event the overtaking vehicle must return to the right-hand side of the roadway before coming within one hundred feet (100') of any vehicle approaching from the opposite direction."

It appears that this section requires the driver of an overtaking vehicle to make sure that the left lane is not occupied by an oncoming vehicle. It is arguable that the principle set out here, though not the specific language, might equally apply to a turning vehicle as well as an oncoming vehicle. However, as we construe this section as controlling passing then it would appear that KRS 189.300, above, is applicable to something other than passing vehicles, as it does not seem reasonable that the legislature would have two separate statutes upon the same subject, one worded in specific terms and the other general.

KRS 189.350(1) provides as follows:

"The operator of a vehicle about to be overtaken and passed shall give way to the right in favor of the overtaking vehicle, upon audible signal being given by the overtaking vehicle, if the overtaking vehicle is a motor vehicle or bicycle."

The duties here set out are clear that the vehicle being overtaken, once it is alerted to this fact by an audible signal, shall give way.

KRS 189.380(1) and (2) provide as follows:

"No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety, and only after a clearly audible signal has been given by sounding the horn if any pedestrian shall be affected by the movement. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement.

A signal of the intention to turn right or left shall be given continuously for not less than the last one hundred (100) feet traveled by the vehicle before turning."

It is rather clear that the duty here placed upon the driver of the turning vehicle is to give an appropriate signal (later defined in the statute) when it is ascertained that the movement of another vehicle will be affected and not to turn until after the signal has been given and after ascertaining that the turn may be made with reasonable safety. The problem with this statute is that it does not make clear whether the driver is obligated to ascertain that the turn can be made with safety at the moment when he gives the signal and elects to make the turn, or whether he must make this decision 100 feet down the road at the exact point where the turn is made.

This question was presented to us in Lockridge v. Mercer, Ky., 438 S.W.2d 486 (1968). In that case Lockridge was operating a pickup truck proceeding east on U. S. Highway 60 near Owensboro, Kentucky. He made a left turn to go into a parallel lane and was struck broadside, as he went into the left lane, by Mercer's truck which

was attempting to pass. There was evidence that Lockridge had given a proper signal. The trial court instructed the jury that Lockridge "was not to turn the Volkswagen to the left or from a direct course upon the highway without first ascertaining that such movement could be made with reasonable safety." Lockridge appealed to this court contending that this instruction was erroneous as it required him to ascertain that the turn could be made in safety at the time of the turn and not 100 feet back up the road at the time he was required to give the signal. In analyzing and deciding this issue we stated as follows:

"It is next contended that the instructions erroneously required plaintiff driver to keep a reasonable lookout to the rear and not to make a turn without ascertaining such movement could be made with reasonable safety. It is apparently appellants' position that this duty should have been limited to the time when the driver was required to give a signal, which was at least 100 feet before actually turning. The argument is that once a driver has given a signal to make a left turn, he no longer has any duty to ascertain whether the turning will reasonably affect the operation of a following vehicle. We know of no reason or authority for such a proposition. The flashing of a turning signal does not discharge all of the duties of a motorist. KRS 189.380(1) provides that no person shall turn a vehicle (from a direct course upon a highway) unless such movement can be made with reasonable safety. Clearly this imposes a continuing duty on a motorist, after giving his signal, to observe traffic conditions both fore and aft up to the time of actual turning. The subject of lookout for vehicles approaching from the rear was discussed in Hainline v. Hukill, Ky., 383 S.W.2d 353. In addition of course, KRS 189.290 requires a motorist to operate his vehicle in a careful manner at all times."

It would seem this forecloses the question of whether or not this statute requires the driver of a left turning vehicle to make certain that the left lane is clear of passing vehicles immediately before making the turn. However, it only goes to the extent that the question is one to be submitted to a jury. We did not say in that case that Lockridge was guilty of negligence as a matter of law and that his negligence was, as a matter of law, the proximate cause of the accident.

When all the statutory law upon the subject is collectively examined it would appear that when a driver intends to turn left he must, at that moment, examine traffic both fore and aft and ascertain that the turn to be made is with safety. He must than activate his turn signal or give a manual signal of his intent to turn and the direction in which the turn will be made. These signals should be continued for the last 100 feet before the turn is executed. If, during this period of time, he ascertains that the turn can not be safely made than of course he would have to abort it. The statutes require that anyone about to pass the vehicle would have to give an audible signal to direct the driver of the turning vehicle's attention to the fact that he is being passed. We seem to say in the Lockridge case that even though the audible signal had not been given the driver of the turning vehicle still has the duty, at the exact time of the turn, to make sure that there is no traffic in the left, or passing lane, coming from his rear. This seems to make the burden upon the turning driver more strict than the statutes contemplate. The Lockridge case may have gone a step further than the statutes when it placed an absolute duty upon the driver of the turning vehicle to clear the left lane at the time of entry. While it is true that the flashing of a turn signal does not discharge all the duties of a motorist as stated in that opinion it is also true that this does discharge some of the duties, at least enough of them that the ultimate turn

should not be at the sole risk of the turning driver.[1]

The question before us in this case is whether West was guilty of negligence as a matter of law in turning left at a time when the Blackwell vehicle was in the process of passing both him and the King vehicle, and whether his negligence was as matter of law a proximate cause of the collision. We have never so held.

The law of negligence has never required more than that a man act in a reasonable manner viewing all the surrounding circumstances. The test is, and has always been, what would a reasonable man have done under the given circumstances. The law has never required the impossible nor even the unusual.

If we assume that our opinion in Lockridge, supra, is a proper construction of our statutory law controlling traffic (an assumption which is not free of some doubt) then the driver of the turning vehicle is required not only to give a proper signal for the required distance before the turn, but to use reasonable care at the time of the turn to make sure that the turn can be made in safety. This rule, like all other rules of law, must be applied with reason and judgment and I do not see how we can fail to take note of the fact that there must be a point in time at which the turning driver is justified in concentrating on his turn and directing his entire attention to the front of his vehicle in order to make sure that the course in which he intends to travel is free of obstruction. To put the matter bluntly, when we require a man to look both fore and aft we should be careful not to say that he was looking aft when he should have been looking fore, or his was looking fore when he should have been looking aft. If West had properly cleared the traffic behind him, given the proper signal, not hearing a horn indicating that there was a passing taking place and then looked forward to clear for oncoming traffic and to make sure that the entry to the Holt Road was clear, and in that short period of time the Blackwell limousine came around the West car and struck him, I am at a loss to see how any court could say that he was negligent as a matter of law.[2]

The law required the limousine to sound its horn before passing. The evidence is conclusive that there was no horn. Could West not assume, since there was no horn, there was no passing? This is what we said in Chambliss v. Lewis, Ky., 382 S.W. 2d 207 (1964). In that case Lewis had entered a main highway from a secondary road in the immediate front of Chambliss' car, in violation of KRS 189.330(4) which requires a motorist entering a main highway from a secondary road to stop and not proceed if an approaching car is so close as to constitute an immediate hazard. In the course of the opinion we said " . . . under the circumstances Chambliss could assume that Lewis would conform to the law and remain where he was until the way was reasonably clear and could act upon that assumption in determining his own manner of using the road." If Chambliss could assume that Lewis would obey the law, why couldn't West assume that Blackwell would obey the law.

There is one statement of fact in the majority opinion which I believe to be in-

1. For a case holding the exact opposite of Lockridge, see Cook v. Gillespie, 259 Ky. 281, 82 S.W.2d 347.

2. West was knocked 70 feet from the point of impact. All indications are that the Blackwell automobile was driving at a high rate of speed, probably in the neighborhood of 60 m. p. h. At this speed an automobile travels 5,280 feet per minute or nearly 100 feet per second. The evidence is that the Blackwell car was abreast of the King car, approximately 100 feet before it struck West. If we extend this distance another 100 feet, then the point where the Blackwell car pulled out from behind the West car into the passing lane would have only been two seconds away from striking West. In short, West only had time to breath twice from the time the Blackwell car pulled into the passing lane until he was struck.

correct. The opinion states "the limousine, after passing the King automobile, struck the motorcycle." I do not believe this to be supported by the evidence. A more accurate statement of the fact would be that the limousine, while in the process of passing the King automobile, struck the motorcycle. The testimony upon which I base my statement in this respect is as follows:

"18 Where were you when the limousine passed you? I mean roughly where were you, say, between Potter's Restaurant and Holt Road?

A. Well, it was somewhere between there. Oh, I have estimated the distance at approximately 100 ft. from the accident when it happened. You mean at the time the limousine come around us?

19 Yes, sir.

A. Well, that was some distance farther than that. I had slowed down to what I imagine to be 35 to 40, or maybe even slower, than this limousine started around us. Now it would be hard for me to determine where that was in reference to where the accident happened.

37 Where was the limousine when he started making his turn?

A. Well, again, I couldn't rightfully say.

38 I mean with relationship to your vehicle.

A. The limousine was at least at my side, and possibly a little bit ahead of me at that time.

39 How far were the two vehicles from you when the collision occurred?

A. Well, I have—I would say it was approximately 100 ft. I would have to say that."

From the foregoing testimony it would appear that the witness is saying that the Blackwell limousine was along about his side when the motorcycle started to turn into the Holt Road. At another point, it appears he is saying that the limousine and the motorcycle were approximately 100 feet ahead of him when they collided. There is an inconsistency here which could only be resolved by the jury. It would be impossible for the motorcycle not to have cleared the left lane had it started its turn across that lane when the limousine was 100 feet away or else the limousine would have had to have been traveling over 10 times as fast as the motorcycle (assuming the left lane of the highway to be 10 feet wide). In any event, it would seem for the majority opinion to make the absolute statement that the limousine had passed the King car might be somewhat misleading.

In conclusion, it is my sincere opinion that questions such as this are better left to juries and in this opinion I do not stand alone, see Blashfield Automobile Law and Practice, Volume 2, Section 113.4 wherein the matter is stated as follows:

"The lookout required of the driver of a vehicle traveling along a highway is largely confined to the observation of vehicles in front rather than to vehicles in the rear, and he need not maintain a constant lookout for overtaking vehicles, even though he is traveling at less than the maximum speed permitted by law. However, he owes the duty to keep some lookout for following vehicles, and when his attention has been called to the presence of a vehicle behind he must maintain a lookout for it. . . . .

The driver of a vehicle must look to the rear for following vehicles when he intends to execute a maneuver which could affect the operation of a following vehicle or endanger the safety of the occupants thereof, and he must maintain his lookout until all danger is past, but there is no absolute legal requirement that he continue to took in the rear-view mirror during the entire time he is executing the maneuver.

Unless the evidence is undisputed and susceptible of but one reasonable inference, whether the driver of a vehicle was negligent or contributorily negligent with respect to lookout for vehicles in the rear, and whether such negligence was the proximate cause of a subsequent accident, are ordinarily questions of fact for the jury."

The trial court set aside the verdict of the jury as being excessive. An examination of the record in this case reveals that this was a close question. It is my opinion that trial courts certainly have some discretion in this respect. I do not think it was abused. I would, therefore, affirm the action of the trial court in resetting the case for trial. As the majority opinion does not deal with the second trial in this matter I will not pursue the subject in this dissent.

For the foregoing reasons, I respectfully dissent.

REED, J., joins in this dissent.